JACKSON COUNTY, MISSOURI, Kansas City, Missouri, State of Missouri ex rel. John Ashcroft, Attorney General, State of Kansas ex rel. Curt T. Schneider, Attorney General, Mid-America Regional Council, Cass County, Missouri, Johnson County, Kansas, Kansas City, Kansas, Robert L. McDowell, Karyn S. McDowell, Robert J. Mihalovic, Gerald L. Purkey, Sevilla A. Purkey, Charlene M. Tunnell, John E. Begley, Myrel H. Begley, Fred Zagaruyka, Katherine F. Zagaruyka, Carolanne L. Beshoner, Joseph A. Lombino, Wanda R. Lombino, Jacqueline Unger, James E. Stout and American Federation of Government Employees (AFL–CIO), Local 2127, Richards-Gebaur Air Force Base, Missouri, Appellants,

v.

General David C. JONES, USAF, Chief of Staff of the United States Air Force, John C. Stetson, Secretary of the Department of the Air Force of the United States, Department of the Air Force of the United States, General George S. Brown, USAF, Chairman of the Joint Chiefs of Staff of the United States, Dr. Harold Brown, Secretary of the Department of Defense of the United States, and Department of Defense of the United States, Appellees.

No. 77–1739.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 15, 1977.

Decided Feb. 7, 1978.

Stanley P. Christopher, Deputy County Counselor (argued), and John Edward Cash, Associate County Counselor, Kansas City, Mo., on appendices and briefs, for appellants.

John F. Ingraham and Robert D. Munro, Asst. City Attys., Kansas City, Mo., J. Paul Allred, Jr., Asst. Atty. Gen., Jefferson City, Mo., Donald R. Hoffman, Chief Asst. Atty. Gen. and Donald E. Jensen, Asst. Atty. Gen., Topeka, Kan., Joseph James, William H. Bates, Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Tom J. Helms, Kansas City, Mo., on appendices, for appellants.

Barbara M. Vache, Kansas City, Kan., for Local 2127.

Larry A. Boggs, Atty., Land and Natural Resources Division, App. Section, U. S. Dept. of Justice, Washington, D. C. (argued), James W. Moorman, Asst. Atty. Gen., and Edmund B. Clark, Atty. Dept. of Justice, Washington, D. C., on appendix and brief, for appellees.

Regina L. Sleater, Atty., Dept. of Justice, Washington, D. C., on appendix, for appellees.

Before HEANEY, WEBSTER and HENLEY, Circuit Judges.

HEANEY, Circuit Judge.

On November 22, 1974, the Secretary of the United States Air Force announced that the Air Force Communications Service (AFCS), with a complement of approximately 2,000 military personnel and 850 civilian employees, located at Richards-Gebaur Air Force Base near Kansas City, Missouri, would be moved to Scott Air Force Base near St. Louis, Missouri. It was also announced that the 442 Tactical Airlift Wing of the Air Force Reserve (442 TAW) would remain at Richards-Gebaur, that the

37th Tactical Airlift Squadron of the Air Force (37th TAS) would be moved to Scott or to another Air Force base, that other Air Force personnel would be relocated to Scott from their present bases and that most of Richards-Gebaur would be closed.

A number of the civilians employed by the Air Force at Richards-Gebaur and various governmental units in the Kansas City area immediately filed suit in the federal District Court for the Western District of Missouri to stop the Air Force from implementing the announced relocations and closure. They alleged that the Air Force had failed to comply with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., (NEPA) and implementing regulations. The District Court enjoined the Air Force from proceeding with the proposed relocations and closure until it had prepared an Environmental Impact Statement (EIS) and otherwise complied with NEPA.[1] Thereafter, the Air Force initiated the steps necessary for compliance with NEPA. A description of proposed alternative actions, a candidate environmental statement, a draft environmental statement and numerous background studies were prepared. Public hearings were held in the affected communities and the Subcommittee on Military Construction of the Committee of the Armed Services of the United States Senate held a hearing on the proposal in Washington, D. C. Among those who testified before the Senate subcommittee were members of the congressional delegations from Kansas and Missouri.

The EIS was issued by the Air Force on January 12, 1977. An action was immediately filed seeking to enjoin the Air Force from proceeding with the proposed plan. It was dismissed as premature because the Air Force had not yet announced its final decision. *Jackson County v. Brown*, 9 ERC 2142 (W.D.Mo.1977). The plaintiffs sought and were denied a stay pending appeal in both this Court and the Supreme Court. The appeal was later dismissed. *Jackson County v. Brown*, No. 77-1187 (8th Cir., April 27, 1977).

On March 25, 1977, the Secretary of the Air Force announced the final decision to implement the proposed action. The Secretary stated that although the relocation might cause "social and economic turbulence * * * in the Richards-Gebaur area" and a housing shortage in the St. Louis area, these effects would be temporary. He further stated that financial savings to the Air Force of $19 million a year would result from the relocations and closure. On May 23, 1977, the Deputy Secretary of Defense approved the decision.

On June 22, 1977, a third action was filed to stop the relocations and closure. The plaintiffs[2] alleged that the EIS was inadequate and that the decision to relocate the AFCS to Scott and to otherwise carry out the proposal was arbitrary and capricious. They asked that the Air Force be temporarily enjoined from implementing the plan until the matter could be presented to, and decided by, the District Court. The District Court denied the plaintiffs' request and the Air Force immediately proceeded to move personnel and equipment from Richards-Gebaur to Scott. The plaintiffs promptly appealed the decision of the District Court pursuant to 28 U.S.C. § 1292(a)(1). After oral arguments before this Court in Novem-

---

1. *McDowell v. Schlesinger*, 404 F.Supp. 221 (W.D.Mo.1975). No appeal was taken from the District Court's judgment.

2. The plaintiffs/appellants in this case are: Jackson County, Missouri; Kansas City, Missouri; the State of Missouri *ex rel.* John Ashcroft; the State of Kansas *ex rel.* Curt T. Schneider; Mid-America Regional Counsel; Cass County, Missouri; Johnson County, Kansas; Kansas City, Kansas; certain named employees (and/or their spouses) of the Air Force employed at Richards-Gebaur Air Force Base;

American Federation of Government Employees (AFL-CIO), Local 2127.

The defendants/appellees in this case are General David C. Jones, United States Air Force, Chief of Staff; John C. Stetson, Secretary of the Department of the Air Force; the Department of the Air Force; General George S. Brown, United States Air Force, Chairman of the Joint Chiefs of Staff; Dr. Harold Brown, Secretary of the Department of the Defense; the Department of Defense. The defendants/appellees will be referred to as the Air Force.

ber, 1977, we denied the plaintiffs' motion for a stay pending appeal. We affirm the decision of the District Court.

## I. NATURE OF REVIEW

■ The Air Force argues that the decision of the District Court should be affirmed because the granting or denial of a preliminary injunction calls for the exercise of judicial discretion and is not to be disturbed on appeal except on a finding of abuse. We recognize the general validity of that argument but reject its applicability to this case. The District Court considered the matter on the basis of all available evidence. There is no reasonable likelihood that further evidence would be adduced at a full trial on the merits. It reviewed the EIS, the background studies, the transcripts of the Senate and public hearings and all affidavits submitted by both the proponents and the opponents of the relocations and closure. Moreover, when the District Court denied the request for a preliminary injunction, the Air Force proceeded immediately with the approved plan. It is readily apparent that our decision in the matter will, for all practical purposes, end the case. Indeed, the plaintiffs conceded at oral argument that further litigation would not be undertaken if relief were denied them by this Court. We, therefore, consider this case as if it is an appeal of a denial on the merits. See *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584-585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Natural Resources Defense Council, Inc. v. Morton*, 148 U.S.App. D.C. 5, 458 F.2d 827, 832 (1972).

## II. APPLICABILITY OF NEPA

■ NEPA was enacted in 1970. The Department of Defense is not excepted from the requirements of the Act, *Committee for Nuclear Responsibility v. Schlesinger*, 404 U.S. 917, 92 S.Ct. 242, 30 L.Ed.2d 191 (1971); *Concerned About Trident v. Rumsfeld*, 555 F.2d 817, 822 (D.C.Cir.1977), and, recognizing this fact has adopted rules and regulations to insure compliance with NEPA by its subordinates, including the Air Force. 32 C.F.R. § 214.1 *et seq.*[3]

■ NEPA is specifically applicable to this relocation because it will directly and substantially affect the physical and economic environments of two major urban centers. It will directly affect the lives of more than 10,000 persons and indirectly affect the lives of thousands more. *See Concerned About Trident v. Rumsfeld, supra*; *City of Rochester v. United States Postal Service*, 541 F.2d 967 (2d Cir. 1976). Each of the following goals which Congress sought to attain through the enactment of NEPA will be affected by the proposed action.

[To] assure for all Americans safe, healthful, productive, an esthetically and culturally pleasing surroundings;

\*      \*      \*      \*      \*      \*

[To] preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

[To] achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities[.]

42 U.S.C. § 4331(b)(2), (4), (5).

The District Court was, therefore, clearly right when it held that the Air Force had to comply with NEPA before it could implement its proposal and the Air Force was wise in not appealing from that decision of the District Court. *McDowell v. Schlesinger*, 404 F.Supp. 221 (W.D.Mo.1975).

## III. ADEQUACY OF THE EIS

We initially determine whether the EIS, prepared by the Air Force, complied with

---

**3.** No issues of national security are before this Court. The only such issues raised before the trial court were resolved in favor of the Air Force. *McDowell v. Schlesinger, supra* at 257–259. At oral argument before this Court, the Air Force asserted for the first time that other and broader national security issues were involved in the proposed relocation. These assertions are unsupported by the record.

the procedural requirements of NEPA.[4] The plaintiffs contend that it did not because it failed to adequately discuss feasible alternatives and failed to adequately consider the housing impacts of the proposed action.

█ To determine adequacy, we consider the EIS, the candidate environmental statement, the draft environmental statement, the background studies and the hearing transcripts and attached affidavits. We do so under a standard of reasonableness. *Environmental Defense Fund, Inc. v. Hoffmann,* 566 F.2d 1060, 1067 (8th Cir. 1977); *Sierra Club v. Froehlke,* 534 F.2d 1289, 1299 (8th Cir. 1976).

> [T]he discussion of environmental effects of alternatives need not be exhaustive. What is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned. * * *
>
> *  *  *  *  *  *
>
> In the last analysis, the requirement as to alternatives is subject to a construction of reasonableness, and we say this with full awareness that this approach necessarily has both strengths and weaknesses. Where the environmental aspects of alternatives are readily identifiable by the agency, it is reasonable to state them— for ready reference by those concerned with the consequences of the decision and its alternatives. * * *

There is reason for concluding that NEPA was not meant to require detailed discussion of the environmental effects of "alternatives" put forward in comments when these effects cannot be readily ascertained and the alternatives are deemed only remote and speculative possibilities[.]

*Natural Resources Defense Council, Inc. v. Morton, supra,* 148 U.S.App.D.C. at 14, 15–16, 458 F.2d at 836, 837–838.

### A. Alternatives

The plaintiffs argue that at least four of the alternatives considered in the preliminary documents and EIS were not really alternatives but were merely minor variations of the proposed action. They also argue that additional alternatives proposed at subsequent stages of the proceedings were given conclusory and inadequate consideration in the EIS.[5]

Five of the alternatives suggested by the Air Force were first set forth in September, 1975, in a document entitled Description of Proposed Action and Alternatives (DOPAA). The Air Force stated that additional viable alternatives would be considered if proposed. The alternatives stated were:[6]

(1) Move AFCS and its technical support units[7] to Scott. AFCS to remain a major command. Nontechnical support functions

---

4. NEPA requires that an EIS be prepared before the federal government or its agencies proceed with a major action. An EIS should include a detailed discussion of:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C)(i–v).

5. For a comprehensive discussion of the history of AFCS and its function and its location at

---

Richards-Gebaur in 1970, *see McDowell v. Schlesinger, supra.*

6. Alternatives (1) through (4) provided that approximately 91% of the base personnel at Richards-Gebaur be transferred to other Air Force bases, with most transferred to Scott.

7. In each alternative, the Air Force considered it essential that certain technical support units, the Detachment 2, 1814 Communications Squadron, 1842 Electronics Engineering Group and the 1815 Test Squadron be located at the same base as AFCS. The functions of these technical support units are directly related to the functions performed by AFCS. In each alternative but (5), the Air Force retained the option of moving the 37th TAS to Scott or to Pope Air Force Base in North Carolina. Also proposed was the relocation of the 1866th Facility Checking Squadron.

to be performed by MAC.[8] 442 TAW to remain at Richards-Gebaur. Richards-Gebaur to remain an active Air Force installation with base administrative, logistical, personnel and community support units.

(2) Same as (1) but Richards-Gebaur to become an Air Force Reserve installation rather than remain an active Air Force installation.

(3) Same as (1) but the AFCS to lose its major command status and become a technical service assigned to MAC.

(4) Same as (2) but require AFCS to perform nontechnical, as well as technical, services.

(5) Maintain the status quo.

The sixth alternative was suggested by the Air Force in April, 1976, in the candidate environmental statement.

(6) Same as (1) with a single exception—the operating support necessary for the 442 TAW and the operating support necessary to protect and maintain Air Force real property at Richards-Gebaur was to be provided by contracting with a civilian firm.

In June, 1976, the Air Force issued a draft environmental statement. Alternatives (1) through (6) were analyzed in detail. On January 12, 1977, the Air Force issued the EIS. The analysis in the EIS was virtually identical to that contained in the draft environmental statement.

The following additional alternatives were proposed at subsequent public hearings.

(7) To consolidate various technical services at Richards-Gebaur, thus, spreading the overhead and reducing overhead costs in relation to operational costs.

(8) To relocate the AFCS to a base other than Scott; the theory being that there were other bases to which the AFCS could be moved to avoid projected housing problems in the Scott Air Force Base area.

(9) To close Scott and move all operations and personnel from that base to Richards-Gebaur.

(10) To postpone any decision until a comprehensive Air Force study is completed.

(11) To adopt one of the McDowell alternatives.[9]

### B. Consideration of Alternatives

The two principal alternatives obviously were: (1) the proposed relocation of AFCS and other units to Scott and closure of Richards-Gebaur, and (2) maintaining the status quo. The plaintiffs concede that these two alternatives were fully and fairly discussed in the EIS. The only points that they make with respect to each of these alternatives are that errors were made in the analysis and that the decision of the Air Force to move to Scott on the basis of this analysis was arbitrary and capricious. We will reach these questions in a later section of this opinion.

The plaintiffs vigorously argue, however, that the other alternatives were not discussed in sufficient detail. We reject this contention.

### 1. Alternative (7).

This alternative proposed to consolidate various technical services at Richards-Gebaur and was initially set forth in a stipulation between the parties dated May 27, 1975. It was considered in the EIS. The reasons given in that document for rejecting this alternative were:

(a) The technical services organization, such as the Air Weather Service, the Audio-Visual Service and the Aerospace Recovery Service, had already undergone reductions in personnel and consolidation with other units would not produce further reductions;

(b) The staff functions of these organizations (personnel, budget, manpower, etc.)

---

8. The Military Airlift Command is headquartered at Scott.

9. These alternatives were proposed by Robert L. McDowell, the original plaintiff in *McDowell v. Schlesinger, supra,* at the hearing held by the United States Senate Subcommittee on Military Construction of the Committee on the Armed Forces on September 15, 1976. EIS, App. 2, Vol. 2, p. 597.

had already been transferred to MAC at Scott Air Force Base;

(c) The transfer of these technical services out of MAC and relocation to Richards-Gebaur would result in requirements for additional personnel; and

(d) The relocation of the Combat Communications Groups to Richards-Gebaur would involve prohibitive relocation and construction costs. It would also involve potential deployment problems, specifically all highly mobile tactical communications equipment, which would be then located at the same base and would decrease the capability to meet deployment schedules. In addition, runways at Richards-Gebaur were not capable of handling the aircraft necessary under frequently scheduled loadings. The analysis in the EIS was included verbatim in the candidate environmental statement and the draft environmental statement. No written or oral exception was taken to the reasons for rejecting this alternative. We believe that the alternative was discussed in reasonable detail. It would have been better had reason (c) been quantified, but this failure was not sufficient to render the discussion inadequate in light of the reasons set forth in paragraph (d).

2. *Alternative (8).*

This alternative of relocating the AFCS to a base other than Scott was considered in the EIS. Obviously, this alternative is not of great interest to most of the plaintiffs and there was little or no discussion of it at the hearings. Notwithstanding lack of interest, it deserved consideration in the EIS because of the concern of civilian employees about housing and public conditions in the Scott Air Force Base area. The Air Force did consider this alternative and rejected it for the following reasons:

(a) Scott was considered best suited to receive AFCS because adequate administrative space was currently available.

(b) MAC, located at Scott, was considered best able to provide certain nontechnical headquarters staff support functions to AFCS due to similar worldwide dispersal of units.

(c) Co-location or consolidation with the Air Force Logistics Command (AFLC) was deemed impractical because of mission incompatibility and costs. The AFLC command structure was neither organized nor intended to support a widely deployed service organization like AFCS. In addition, no facilities were available at Wright-Patterson which could be used to accommodate AFCS.

(d) Incompatibility of functions and lack of space also render impractical the location of AFCS with either the Air Force Systems Command (AFSC) at Andrews Air Force Base, the Air Force Security Service (AFSS) at Kelly Air Force Base, the Strategic Air Command (SAC), the Tactical Air Command (TAC), and the Aerospace Defense Command (ADCOM).

Here again, the analysis in the EIS was included verbatim in the candidate environmental statement and the draft environmental statement. No objections were taken to the explanation that this alternative was not viable. Under all of these circumstances, we find that the discussion in the EIS was adequate.

3. *Alternative (9).*

This alternative of closing Scott Air Force Base and moving the facilities located at that base to Richards-Gebaur was discussed in the EIS. The reasons advanced for rejecting this alternative were: (a) MAC had approximately one and one-half times as many manpower authorizations as AFCS, and Richards-Gebaur did not have facilities to house a unit of that size; and (b) the one-time cost of the move, combined with military expenditures necessary to build adequate facilities, would be prohibitive.

The plaintiffs do not argue in their brief that the reasons advanced by the Air Force for the rather summary rejection of this alternative are invalid. This alternative was clearly not feasible; thus, no additional analysis was required.

4. *Alternative (10).*

United States Senator Thomas Eagleton of Missouri, in a letter of October 31, 1975,

to James Schlesinger, the Secretary of Defense, proposed awaiting any decision on relocating the AFCS or closing Richards-Gebaur until an indepth study involving some thirty Air Force bases was concluded. This proposal was not discussed in the EIS, the candidate environmental statement or the draft environmental statement. The plaintiffs vigorously argued that the failure of the EIS to discuss this proposal made the EIS inadequate. At oral argument, this issue was raised and the Air Force stated that there simply was no proposal to consider a thirty-base realignment. In their rebuttal, the plaintiffs did not contest this explanation. We do not, therefore, consider the failure of the EIS to address this proposal to be a critical defect.

### 5. Alternatives (11)(a), (b) and (c).

The McDowell alternatives, which we denote as alternatives (11)(a), (b) and (c), were suggested by Robert L. McDowell at a public hearing in Kansas City in September, 1976 (see n.8, supra). These alternatives were submitted after the draft environmental statement was issued and before the EIS was published. They were carefully thought out and accompanied by a detailed cost analysis and comparison. The McDowell analysis gave rise to a study by the General Accounting Office and resulted in the Air Force making substantial changes upward in its cost analysis of the proposed action.

Alternative (11)(a) proposed to keep AFCS and the 442 TAW at Richards-Gebaur, to reduce all personnel services and to privately contract for base operating services and maintenance. While the proposed action, alternative (6), would admittedly produce annual savings in excess of $5 million per year, McDowell estimated that under alternative (11)(a) the annual savings would be $8.3 million per year. McDowell's

estimate, however, was based on the Air Force's estimate that the private contract to provide for base operating services and maintenance would require two hundred employees. The Air Force estimate was for the proposed action which would reduce base personnel by 91%. The (11)(a) estimate is, therefore, substantially too low because under (11)(a), base personnel would only be reduced by 40%. It is obvious that it would cost more to provide base operating services and maintenance under this proposal. Considering the Air Force figures for other proposals, the cost of contracting for base operating services and maintenance under alternative (11)(a) would be substantially higher than that estimated by McDowell and would, in all probability, be more than sufficient to wipe out the annual savings of $8.3 million projected under alternative (11)(a) by McDowell.[10]

McDowell's alternative (11)(b) proposed to close Richards-Gebaur, to move AFCS into a privately owned, leased building in the Kansas City area and to move the 442 TAW to Whiteman Air Force Base in Missouri. The Air Force rejected this alternative arguing that although the relocation of the 442 TAW to Whiteman Air Force Base could be accomplished with little degradation to the unit's capability to perform its mission, construction costing in excess of $4.2 million would be required to adequately house the unit at Whiteman. Moreover, the Air Force pointed out that for AFCS personnel, base housing at Richards-Gebaur would have to be retained or relocation allowances paid to those personnel who were forced to move out of base housing if Richards-Gebaur was completely closed. In addition, the Air Force noted that the administrative space required to house AFCS was not currently available in the Kansas

---

**10.** The Air Force advanced the following argument in response to alternative (11)(a) that we deem to be utterly without merit. They stated that current Department of Defense regulations do not permit pro rata cost sharing of facilities jointly used by active and reserve units of the various branches of the Armed Services. Thus, no savings would be effected by using a portion

of Richards-Gebaur to accommodate Navy and Air Force personnel in space vacated by the 1840th Air Base Wing (1840 ABW). Any serious cost savings efforts must disregard antiquated regulations designed to perpetuate artificial barriers between branches of the Armed Services and between active and reserve units of the various services.

City area. McDowell estimated that under (11)(b), there would be annual savings of at least $6 million more than those estimated for the proposed action. The Air Force further pointed out that McDowell's estimate did not include an estimate of the cost of transferring and relocating the personnel presently assigned to the 1866th Facility Checking Squadron (1866 FCS).

The Air Force was remiss in failing to examine this alternative in greater detail and in failing to attach cost estimates for the transfer of the 1866 FCS and housing subsidies for AFCS personnel. The fact remains, however, that there is little in this record to suggest that leased space for the AFCS could be obtained at a lower cost than the already available space at Richards-Gebaur, or that leased space was available at all. A more detailed analysis in the EIS of the actual costs and personnel reductions which could have resulted from (11)(b) would have been desirable. As well, a factual basis for the EIS statement that leased space to house the AFCS was not available in the Kansas City area should have been included. However, the record does support the discussion in the EIS and we do not find that the less than thorough discussion of (11)(b) renders the EIS inadequate.

■ Alternative (11)(c) proposed keeping AFCS at Richards-Gebaur but reducing Richards-Gebaur to an Air Force station and reducing all personnel services. A private contract would provide base maintenance. The 442 TAW would be moved to Whiteman Air Force Base. The Air Force rejected this alternative for reasons previously discussed. The first part of the alternative, keeping AFCS at Richards-Gebaur and contracting for base maintenance, was thoroughly considered under alternative (11)(a). Moving the 442 TAW to Whiteman was considered under alternative (11)(b).

As we stated above, sufficient justification was given for rejecting various portions of these alternatives, but a detailed analysis should have been included in the EIS. A complete review of the record, however, convinces us that although not as thorough as desired, the consideration of alternatives in the EIS is adequate.

### C. Housing

The plaintiffs contend that the EIS is inadequate because it fails to adequately consider the impact on housing which would be caused by the relocations and closure. The EIS does discuss the impact of the proposed action on housing in the communities around Richards-Gebaur and Scott. Although the discussion in the EIS is not lengthy, the background studies which accompany the EIS provide a rather detailed analysis of the problem. The large number of homes which would be available for sale would greatly depress the real estate market in the Richards-Gebaur area while the large influx of families into the Scott area would create a demand for homes which far exceeds the supply in the communities adjacent to Scott.[11]

■ In such situations, the Air Force aids personnel who, by reason of transfer, will be forced to sustain a financial loss when selling their homes. The cost of this aid is considered in the EIS although the plaintiffs dispute the accuracy of the Air Force's figures. As noted earlier in this opinion, we are to determine only whether the EIS adequately discusses the impacts and effects of the proposed action. The purpose of the EIS is to insure that all relevant factors and arguments are considered by the agency and also presented to the public, Congress and the executive branch of the federal government. The plaintiffs presented their arguments concerning the

11. Scott is located near St. Louis, Missouri, which has a large enough supply of rental and purchase properties to absorb the influx of personnel which will result from the relocation of AFCS. The parties dispute whether or not certain portions of the St. Louis metropolitan area are within a one-hour rush hour commuting distance of Scott. A one-hour commuting distance is that considered acceptable by the Air Force. We need not determine which party is correct in this dispute. As discussed earlier in this opinion, we are not to decide whether the Air Force's decision was the most correct one, but merely whether all relevant factors were presented to and considered by the decision-making agency.

inaccuracies of the Air Force's housing analysis at the hearings before the United States Senate Subcommittee on Construction of the Committee on the Armed Services. *See*, Testimony of Donald H. Ong, EIS, App. 2, Vol. 2, p. 538 *et seq.* The Air Force responded to these arguments, EIS, App. 3, *inter alia*, pp. 21–22. In addition, these arguments are in the record and anyone considering the proposed action had before them the analysis of both the Air Force and the analysis of those challenging the accuracy of the Air Force computations.

■ In light of all these factors, we do not find that the EIS fails to comply with the requirements of NEPA. The consideration of the housing impact resulting from the proposed action was adequate.

### IV. SUBSTANTIVE REVIEW

■ The purpose of the Air Force is to achieve a substantial reduction in costs. Under NEPA, indirect, as well as direct, costs and consequences of the proposed action must be considered. Moreover, under NEPA, if the stated purpose will not be achieved by the proposed action or if the indirect costs or consequences are so great that a decision by the agency to proceed with the proposed action can only be said to be arbitrary and capricious, then a court may nullify the decision.

Given an agency obligation to carry out the substantive requirements of the Act, we believe that courts have an obligation to review substantive agency decisions on the merits. * * * [T]he prospect of substantive review should improve the quality of agency decisions and should make it more likely that the broad purposes of NEPA will be realized.

* * * * * *

The standard of review to be applied here and in other similar cases is set forth in *Citizens to Preserve Overton Park v. Volpe*, [401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)]. The reviewing court must first determine whether the agency acted within the scope of its authority,

and next whether the decision reached was .arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In making the latter determination, the court must decide if the agency failed to consider all relevant factors in reaching its decision, or if the decision itself represented a clear error in judgment.

*Environmental Defense Fund v. Corps of Eng., U. S. Army*, 470 F.2d 289, 298–300 (8th Cir. 1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). *See also Sierra Club v. Froehlke, supra* at 1305.

The plaintiffs argue that the decision of the Air Force to proceed with the proposed action was arbitrary and capricious. In support of this contention, they allege that the cost reduction purpose of the Air Force will not be accomplished, especially when the direct costs of the proposed action to other federal agencies and the indirect costs and consequences to impacted communities and individuals are considered.

#### A. Direct Costs

The Air Force has estimated a one-time direct cost of $36.7 million for the proposed action, while the plaintiffs estimate a one-time cost of $41.7 million.[12] The Air Force estimated that annual savings of $18.93 million would be realized under the proposed action; plaintiffs' estimate was $5.43 million. Our own analysis results in estimates of one-time cost of $36.7 million and annual savings of $15.53 million. For a detailed analysis of these figures, *see* Appendix I, One-Time Costs, and Appendix II, Net Annual Savings. Even if we accept the plaintiffs' estimates, it is clear that within a few years the annual savings will offset the direct costs of the relocation. Therefore, insofar as the final decision to relocate AFCS and close Richards-Gebaur was based on direct costs, we cannot say that it was arbitrary and capricious.

#### B. Indirect Costs and Consequences

The indirect costs and consequences, including the significant adverse economic

---

**12.** This estimate was made by McDowell in his testimony before the Senate Subcommittee, EIS, App. 2, Vol. 2, p. 597. *See* n.9, *supra.*

impacts on communities and individuals in the Kansas City area and the impacts on personnel that are to be relocated in the St. Louis area, must be considered by the Air Force. *See Concerned About Trident v. Rumsfeld, supra; City of Rochester v. United States Postal Service, supra.* Thus, the Air Force must consider factors other than its budget or that of the Department of Defense. It must consider the economies of the impacted communities and the economic effects upon the individuals who live in those communities. In the final analysis, the people who pay the bills for Kansas City, Belton, Grandview and the other communities near Richards-Gebaur are the same people who pay the bills for the defense of this nation.

### 1. *Housing.*

The short-term economic impact of the proposed action on housing in the Kansas City metropolitan area may be considerable. The Air Force estimated that the relocation of Air Force personnel alone could result in the vacation of 1,415 resident-owned units and 1,170 rental units. Offsetting these losses, however, is an estimated demand for 10,000 additional housing units annually. This demand should alleviate the excess supply in a relatively short period. We also note that the Department of Defense Homeowner's Assistance Program will compensate individuals transferred from Richards-Gebaur to Scott who sell their homes at a price below the reasonable market value. For projected costs of this program, *see* Appendix I(C).

The proposed action will also result in an increased demand for housing in the communities near Scott. The costs of purchasing or renting housing will obviously be inflated. While the supply of housing in the communities near Scott is very low, there is a sufficient supply of housing available in the greater St. Louis metropolitan area. Most relocated personnel will have to commute a greater distance, consume more energy and spend more time commuting than was required when they lived at Richards-Gebaur.[13]

### 2. *Schools.*

The school districts in the Richards-Gebaur area will experience decreases of up to 35% in the student populations,[14] and districts in the communities near Scott will have comparable increases. The Department of Health, Education and Welfare compensates school districts with large percentages of armed services personnel dependents. This aid will continue to the districts in the Kansas City area until current programs, staffs and bond issue obligations can be partially or totally adjusted. *See* Appendix I(C). Thus, aid will be paid to school districts in the Kansas City area as well as to those adjacent to Scott.

### 3. *Unemployment.*

Unemployment in the Richards-Gebaur area will also rise. While some highly skilled civilian employees will be transferred to Scott, many others will be without jobs when AFCS relocates. These individuals will suffer a wage loss and the community will suffer a tax loss. In addition, for each employee who loses his job at the air base, at lease one more individual in the community can expect to lose his job as a result of the decrease in economic activity.

The Air Force estimated that 2,000 persons will lose their jobs as a result of the proposed action. This will cause an increase in a temporary unemployment rate in the Kansas City metropolitan area from 5.4% to 6.0%. As mitigating factors, ap-

---

13. *See* n.11, *supra.*

14. Richards-Gebaur dependents represent approximately 4,123 (1.9 percent) of the 219,000 average daily attendance (ADA) in public schools in the three-county area. However, five districts service 72.3 percent of all Richards-Gebaur dependents (Table 26). Belton School District No. 124 has the greatest concentration; 1,524 of 4,313 ADA, or 35 percent, are dependents of Richards-Gebaur personnel. Next, in order of percentage of ADA, are Consolidated District No. 4 (areas within Kansas City, Grandview and Lee's Summit), 13 percent; Raymore-Peculiar R–2, 5.3 percent; Harrisonville-Cass R–9, 4.5 percent; and finally Consolidated No. 1, 3.8 percent (areas within Kansas City and Grandview). The remaining Richards-Gebaur dependents are distributed in approximately 80 communities.

EIS, p. 67.

proximately 300 Richards-Gebaur employees will leave second jobs they now hold when they transfer to Scott, an estimated 620 spouses of Richards-Gebaur employees will leave their present jobs when the family moves to Scott and unemployment compensation payments of $5.8 million will be paid to those idled by the move. *See* Appendix I(C).

### 4. *Business.*

The relocations and closure and the consequent loss of employment will have a significant impact on other economic activities in the area. The Air Force estimated that the loss in payroll alone will exceed $100 million a year. Many small businesses in the area will be adversely affected. The economic impacts will be mitigated by the measures discussed above and by Small Business Administration loans and Economic Recovery Assistance grants. Unfortunately, such loans and grants will only mitigate a fraction of these losses. Some further mitigation will occur because retired military personnel now purchasing from the Richards-Gebaur commissary will be required to make their purchases from local businessmen.

### 5. *Summary.*

In the light of the impact of the relocation on housing, employment, schools and business, we have serious doubts as to whether the annual Air Force savings of approximately $15.5 million per year will be sufficient to offset the adverse economic impacts incurred by communities, businesses and individuals in the Kansas City area. It follows that the decision to relocate is questionable.

■ The Air Force should have given greater consideration to the economic effect of its action on the communities concerned and it should have attempted to strike a better balance between savings to the Department of Defense and the direct and indirect cost to other governmental agencies, local units of government and private citizens. But for this Court to set aside the action of the Air Force, something more must be shown than that the decision was an unwise one—it must be shown that the decision was an arbitrary and capricious one. We cannot say that it was. Had Richards-Gebaur been located in a smaller community our decision might well have been different because the federal action would undoubtedly have seriously damaged the long-term economic vitality of such a community. Here, the Kansas City metropolitan area contains 1.3 million people and the economy is strong and diverse enough to absorb the economic losses resulting from the proposed action. This is particularly true if the agencies of the United States government promptly meet their responsibility to those individuals and communities affected by the action. Under the circumstances, we must hold that the decision of the Air Force to relocate the AFCS from Richards-Gebaur to Scott Air Force Base was not arbitrary and capricious.

## V. CONCLUSION

The EIS was adequate and the final decision to proceed with the proposed action was not arbitrary or capricious. We affirm the District Court's denial of the preliminary injunction.

## APPENDIX I
### ONE TIME COSTS

| | Estimates with Support in the Record | USAF | Plaintiffs | Explanation of Discrepancy |
|---|---|---|---|---|
| **A. AIR FORCE.** | | | | |
| Relocation: | | | | The discrepancy in military and |
| Military & Civilian Personnel | 9.8 | 9.8 | 15.0 | civilian relocation estimates is, |
| Transportation | .2 | .2 | .2 | in large part, due to the fact |
| Telecommunications Equipment | .9 | .9 | 2.5 | that USAF included some of |
| Severance Pay | 1.9 | 1.9 | .0 | this cost in costs to Other Agencies, *see* C, *infra*. The |

## ONE TIME COSTS

| | Estimates with Support in the Record | USAF | Plaintiffs | Explanation of Discrepancy |
|---|---|---|---|---|
| **A. AIR FORCE** | | | | |
| Construction/Renovation | 1.3 | 1.3 | 1.3 | cost of relocating telecommunications equipment was analyzed in detail by USAF in EIS, Background Study 19R, pp.37–43, and the USAF estimate is reasonable. Plaintiffs' figures are items in EIS, App.2, Vol. 2, p.607. USAF estimates appear generally in EIS, p.156. |
| Subtotal | 14.1 | 14.1 | 19.0 | |
| **B. CONSTRUCTION SAVINGS.** | | | | |
| Construction Contract for R–GAFB would be cancelled | 6.1 | 6.1 | 0 | Plaintiffs did not include this contract cancellation in their estimate. |
| Subtotal | (6.1) | (6.1) | (0) | |
| **C. OTHER AGENCIES.** | | | | |
| Department of Defense Homeowner's Assistance | 7.0 | 7.0 | 19.9 | Plaintiffs apparently included some of these costs to Other Agencies in their estimate of military and civilian relocation costs, *see* A above. Plaintiffs' estimates from EIS, App.2, Vol.2, p.607. USAF estimates from EIS, pp.157–58. |
| Department of H.E.W. Payment to School Districts | 2.9 | 2.9 | 1.1 | |
| Department of Commerce SBA Loans | .3 | .3 | .0 | |
| Department of H.U.D. Mortgage Foreclosures | 8.5 | 8.5 | .0 | |
| Economic Adjustment Committee Economic Recovery Assistance | 4.2 | 4.2 | .0 | |
| State Employment Agency Unemployment Compensation | 5.8 | 5.8 | 1.7 | |
| Subtotal | 28.7 | 28.7 | 22.7 | |
| TOTAL | 36.7 | 36.7 | 41.7 | |

## APPENDIX II

## NET ANNUAL SAVINGS

| | Estimates with Support in the Record | USAF | Plaintiffs | Explanation of Discrepancy |
|---|---|---|---|---|
| **A. SAVINGS.** | | | | |
| Net Manpower Reduction: | | | | Plaintiffs contend no military reduction will occur because all military personnel, officers and airmen, will be transferred to other bases. On the basis of this record we reject this contention and accept the Air Force estimate of $11.2 for military personnel. Plaintiffs also contend that of 711 civilian positions, 246 have been vacant since July, 1976. Therefore, only 495 actual separations of civilian employees will occur (711–246 = 495), and most of these positions are base level or $15,677/yr. Thus, 495 x $15,577 = $7,760,115 personnel savings. EIS, App.2, Vol.2, p.615. For purposes of our computation we accept the plaintiffs' estimate on savings related to civilian personnel. |
| Military Pay | 9.5 | 9.5 | 0 | |
| Civilian Pay | 7.8 | 11.2 | 7.8 | |

NOTE: All figures are in millions. All USAF figures from EIS, p.158. The plaintiffs' figures are apparently taken from a statement by Robert L. McDowell at the Senate hearings submitted in written form with attachments. EIS, App.2, Vol.2, pp.597–627.

## NET ANNUAL SAVINGS

| | Estimates with Support in the Record | USAF | Plaintiffs | Explanation of Discrepancy |
|---|---|---|---|---|
| **A. SAVINGS** | | | | |
| Contract Cancellations | 0 | 0 | .6 | Plaintiffs' figure from EIS, App.2, Vol.2, p.607. USAF included these other savings amounts in their computation under O & M Funds below. *See* EIS, Background Study 19R, pp.7–9. |
| Civil Engineering O & M | 0 | 0 | 2.4 | |
| Other Base O & M | 0 | 0 | 1.6 | |
| TOTAL SAVINGS | 17.3 | 20.7 | 12.4 | |
| **B. COSTS.** | | | | |
| O & M Funds | 1.64 | 1.64 | | USAF included the $4 million BOS contract under O & M Funds. USAF and plaintiffs' estimates do not greatly differ except for the difference in military reduction. Absent that dispute, both estimates of annual savings are similar. *See* EIS, Background Study 19R, pp.7–9; EIS, App.2, Vol.2, p. 607. |
| CHAMPUS | .12 | .12 | .02 | |
| Communications | .01 | .01 | | |
| Annual P & I Payments— Base Housing | | | .64 | |
| Annual BAQ Payments | | | 1.43 | |
| Increased Utilities at Scott | | | .26 | |
| Increased Medical Costs at Scott | | | .33 | |
| Increased Telephone Trunks | | | .29 | |
| BOS Contract R–G | | | 4.00 | |
| TOTAL COSTS | 1.77 | 1.77 | 6.97 | |
| NET ANNUAL SAVINGS | 15.53 | 18.93 | 5.43 | |

NOTE: All figures are in millions. All USAF figures from EIS, p.158. The plaintiffs' figures are apparently taken from a statement by Robert L. McDowell at the Senate hearings submitted in written form with attachments. EIS, App.2, Vol.2, pp.597–627.