The UNITED STATES of America for the Use and Benefit of Herman SPIKES et al.

v.

AMERIC INCORPORATED and American Fidelity Fire Insurance Company.

Civ. A. No. 74–228.

United States District Court, M. D. Louisiana.

June 14, 1976.

Curtis A. Calloway, Lacour & Calloway, Baton Route, La., for plaintiffs.

Paul H. Spaht, Kantrow, Spaht, Weaver & Walter, Baton Rouge, La., for Americ Inc. and American Fidelity Fire Ins. Co.

E. GORDON WEST, District Judge:

Plaintiff Herman Spikes sues under the Miller Act, 40 U.S.C. §§ 270a–270d, to recover monies allegedly due him from Americ, Inc., for "fill" hauling which he al-

legedly orally sub-contracted to perform for Americ under its primary contract with the U. S. Army Corps of Engineers for emergency levee topping construction at Morganza, Louisiana, in 1974. Spikes claims that Americ owes him for monies withheld from his payments during the project, and for work which he claims was performed but was totally unpaid at the project's completion. Americ denies that it owes plaintiff anything, and counterclaims for damages it allegedly sustained as a result of what it claims was Spikes' breach of the alleged oral contract, which required it, Americ, to engage additional trucks at greater expense to complete the job. This Court has exclusive jurisdiction over plaintiff's claim for monies allegedly due him as a sub-contractor. 40 U.S.C. § 270b(b). We have ancillary jurisdiction over the counterclaim asserted against plaintiff which arose out of the same transaction. F.R.C.P. § 13(a).

On July 15, 1975, on defendants' motion, the Court dismissed the claim of Curtis Spurlock for failure to answer interrogatories as ordered by the Court. The Court was informed on January 13, 1976, that the claim of Thomas Vandiver had been amicably settled.

This case was tried to the Court without a jury on January 13, 1976, and now after due consideration of the evidence and arguments of counsel, this Court concludes that neither plaintiff nor defendant has proved by a preponderance of the evidence the existence of an oral contract. Each party's claims based on breach of contract theory necessarily must fall, and plaintiff's claim for monies due him must be measured on a quantum meruit basis, i. e., by the reasonable value of his services.

Herman Spikes and Americ, Inc., each submitted bids for an emergency levee topping contract pursuant to the U. S. Army Corps of Engineers bid solicitation of March 14, 1974 (No. DACW29–74–R–2032), which was awarded to Americ on or about March 20, 1974. Shortly thereafter, Herman Spikes contacted James H. Hutchinson, Americ's officer, about the possibility of his (Spikes') sub-contracting with Americ to haul "fill" from borrow pits to various pre-designated points along the levees where the dirt would be put in place and compacted by Americ or one of its sub-contractors. Spikes and Hutchinson met at the jobsite near Morganza, Louisiana, a few days later and after discussions were had as to the terms of their tentative agreement, they purportedly contracted orally that Spikes would have the job of transporting the "fill" necessary to raise the levee heights to the levels required by the Corps' contract specifications.

Following their "handshake on the deal", and after the commencement of construction on April 1, 1974, the relationship between Spikes and Americ quickly broke down. Spikes allegedly failed to have enough trucks on the jobsite to get the work accomplished, due to either mechanical difficulties, non-compliance with Corps' safety regulations, or sheer inability, thereby forcing Americ to retain additional trucks in order to move the volume of dirt required by that phase of the contract. Prior to its efforts to secure additional trucks to move the dirt, Americ requested Spikes to honor his "obligations", including complying with Corps' safety requirements and having the necessary trucks to do the job. Americ sent telegrams to Spikes on April 22 and April 23, 1974, which he never acknowledged, informing him that he was in default of his "contractual obligations". On April 30, 1974, again by telegram, Americ notified Spikes that if he did not have the minimum number of trucks on the jobsite the next morning, their "contractual" relationship would be terminated. Spikes did not procure the number of trucks requested by the morning of May 1, 1974, and Americ proceeded to retain its own truckers thereafter until construction was completed on or about June 17, 1974.

No one other than Spikes and Hutchinson was present when their "bargain" was struck in Hutchinson's two-seater Porsche automobile, and thus, the very existence of a contract must be judged by these parties' testimony and by circumstantial evidence

since the agreement was never reduced to writing. La.R.C.C. § 2277[1] Spikes testified that he and Hutchinson agreed that he would "move all of the dirt to be moved." Hutchinson too testified that he and Spikes contracted for Spikes "to do all the hauling on the job and take that problem off my back." As far as this Court is able to discern, Americ's motive for contracting was all that was mutually agreed upon. The completely divergent testimony and circumstantial evidence fails to establish the existence of mutual consent as to Spikes' principal cause for contracting, Americ's promise to pay a fixed unit price for his services.

Spikes testified that Americ promised to pay him $1.50 per cubic yard of dirt *hauled*, whereas Hutchinson testified that Americ agreed to pay Spikes $1.50 per cubic yard of dirt *in place*. The difference is considerable, since dirt in place is much more compact than when being hauled, and, naturally, yields much less volume. Spikes testified that he planned to pay his drivers $1.25 per cubic yard hauled on "long runs", and 90 cents per cu. yd. on "short runs", thereby profiting 25 cents and 60 cents for each cubic yard of dirt hauled by his drivers on "long runs" and "short runs" respectively. Yet Spikes offered nothing to corroborate his testimony, and in fact, an examination of the payments to him individually both before and after "termination" of the "contract" on May 1, 1974, shows that they consistently were computed at the rate of $1.25 per cu. yd. of dirt actually hauled.

The proposed AGC standard form subcontract, prepared by Hutchinson but which Spikes refused to sign when submitted to him, listed the price to be paid simply as "One Dollar & 50/100 Per Cubic Yard", and then stated that "payment is on a unit price basis and quantity is to be based on cross-sections taken before and after embankment construction per paragraphs 1–5.2 and 1–6.2 of the specifications." This proposed subcontract serves only to indicate Americ's belief of what it understood the price to be, since it never became the law between the parties. La.R.C.C. § 1901. Spikes testified that he refused to sign the proposed subcontract because it contained terms that were not orally agreed to, including the price per unit.

What we are left with then is plaintiff's version as to what unit price was to be paid for his work, $1.50 per cu. yd. hauled, versus Hutchinson's account as to the unit price Americ was bound to pay, $1.50 per cu. yd. in place, versus what was actually paid Spikes both before and after "termination", $1.25 per cu. yd. hauled. Although we have an idea of what probably was agreed upon, based on judicial experience, we cannot take judicial notice of industry practice where no evidence was introduced to establish such. Nor can we supply evidence since that is the duty of counsel. Unfortunately, in a suit on an oral contract, parol and circumstantial evidence is all we have to rely upon, and in this case, the evidence is inconclusive to establish in either side's favor a condition critical to the existence of the purported contract. The Court concludes that, based upon the evidence before us, there was a difference in intent between the parties as to the unit price Americ was to pay in return for plaintiff's services, and thus there was no mutual consent, and no contract. La.R.C.C. §§ 1824, 1945(4). Spikes operated under unilateral error of fact as to his motive for contracting, that is, he believed that Americ had agreed to pay a unit price which in fact it had not agreed upon, and therefore, there was no contract.[2] La.R.C.C. §§ 1823–1827,

---

1. "All agreements relative to movable property, and all contracts for the payment of money, where the value does not exceed five hundred dollars, which are not reduced to writing may be proved by any other competent evidence; such contracts or agreements, above five hundred dollars in value, must be proved at least by one credible witness, and other corroborating circumstances."

2. If the Court had found the existence of an oral contract, a serious question would have arisen as to whether federal common law or Louisiana law would govern the breach of contract claims. Cf. *F. D. Rich Co., Inc. v. U. S.,*

1896; *North Development Co., Inc. v. McClure*, 276 So.2d 395 (La.App. 2nd Cir. 1973); *Jefferson Truck Equip. Co. v. Guarisco Motor Co.*, 250 So.2d 211 (La.App. 1st Cir. 1971); Smith, *A Refresher Course in Cause*, 12 La.Law Review 2, at pp. 9, 29.

■ Plaintiff's claim therefore must be evaluated on a quantum meruit basis, measuring the reasonable value of his services by the circumstances of this case. *U. S. ex rel. Altman v. Young Lumber Co.*, 376 F.Supp. 1290 (D.S.Car.1974); *U. S. for use of Bldg. Rentals Corp. v. Western Cas. & Sur. Co.*, 498 F.2d 335 (C.A.9 1974); *North Development Co., Inc. v. McClure*, supra.

■ One of the other drivers, Benny James, testified that when he began hauling he was paid at the rate of $16.50 per hour for 2–3 days until Hutchinson realized that his compensation exceeded that received by other drivers. James thereafter was paid $1.25 per cu. yd. of dirt hauled. An examination of Americ's cancelled checks (numbers 542, 563, 673, & 711) paid to Spikes shows that when he was paid on a per unit basis, the price was consistently $1.25 per cu. yd. hauled. Spikes and other drivers were at times paid an hourly rate of $16.00 per hour. However, since no evidence was offered to show how many hours of hauling Spikes and his drivers performed, a unit basis is the only means available to establish a reasonable value for his services. Based upon the unit rate received by other drivers, including those whose checks were jointly payable to Spikes, the Court believes that $1.25 per cu. yd. hauled is a reasonable value to compute any recovery due Spikes on a quantum meruit basis.

An examination of the evidence introduced by these parties reveals the following:

(1) For the week of April 16–24, 1974, Spikes' truck no. 33 hauled 648 cu. yds. of dirt. The computation sheet submitted by Americ shows that Spikes was credited only with 636 cu. yds. hauled, and after deductions for expenses, Spikes netted $701.00. Spikes should have grossed $810.00 (648 × $1.25), and after expense deductions, should have netted $716.00. He is entitled to a balance of $15.00 (Check # 563).

(2) For the week of April 16–25, 1974, Spikes' truck no. 32 hauled 462 cu. yds. of fill. Americ's computation sheet shows he was properly credited with this amount, but after a deduction of $426.00 for "reserve against cross-section", Spikes netted only $127.50 (Check # 563). Eliminating the reserve since there was no contract for Americ to reserve against, Spikes is due back the $426.00 deduction.

(3) For the week of May 9–15, 1974, Spikes' truck no. 33 transported 386 cu. yds. of fill. He was so credited by Americ, and after a fuel deduction of $8.91, netted $486.09 (Check # 673), and is due no more.

(4) For the week of May 23–29, 1974, Spikes' truck no. 33 hauled 216 cu. yds. One ticket, No. 8 dated May 27, attached to Americ's worksheet, indicated 21 cu. yds. hauled. We believe that because every other load carried by # 33 was 12 cu. yds., this figure was transposed and this particular load was actually 12 cu. yds. Spikes was properly credited for hauling 216 cu. yds. and was paid a net of $270.00, and is due no more here (Check # 711).

(5) For the week of May 23–29, 1974, Spikes' truck no. 6 carried 234 cu. yds. of fill. This truck carried 13 loads, and while Spikes' tickets list the amount hauled variously as "21 c. y." and "22 c. y.", this Court agrees with Americ's computation sheet which indicates that truck # 6 had an 18 cu. yd. payload capacity. This finding is corroborated by the breakdown of Spikes' final earnings during the week of May 30—June 5, 1974, where he was credited with hauling "12 loads at 18 c. y." at Krotz Springs, Louisiana, with truck # 6. Americ's computation sheet failed to credit Spikes with one haul, thus he is due $22.50 (18 × $1.25).

417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *Burgess Const. Co. v. Morrin & Son Co., Inc.*, 526 F.2d 108 (C.A.10 1975), fn. 2; *U. S. for use of Bldg. Rentals Corp. v. Western*

*Cas. & Sur. Co.*, supra., fn. 4. We apply Louisiana law to determine that there was no contract.

(6) Regarding the volume of work Spikes claimed he performed but was not paid for at Krotz Springs, he has failed to meet his burden of proving not only that he was not paid, but that he even performed that much work. His testimony as to hauling he performed at Krotz Springs was completely based upon hearsay (oral reports of his drivers) and was totally self-serving. It was even based upon notes he himself made the night before trial. The only evidence relevant to Spikes' working at Krotz Springs during the week of May 30—June 5, 1974, credits him with 12 loads at 18 cu. yds. × .80 cents per yd., for a total of $172.80, which he was paid.

(7) Americ deducted $299.25 from Spikes' check # 542 as a "reserve against contract". Plaintiff is entitled to reimbursement of this amount since there was no contract. While plaintiff claimed that there was a deduction in the amount of $329.95 from another of his checks, also as a "reserve against contract", we have been unable to find it.

(8) Since we have held that there was no contract, plaintiff is not entitled to recover 25 cents for each yard of dirt hauled by other drivers retained by Americ.

(9) The Court has given careful consideration to whether Spikes should be reimbursed for expenses which were deducted from his checks. After examining copies of Americ's cancelled checks to other drivers after May 1, 1974, when the relationship between Americ and Spikes was "terminated", the Court concludes that expense reimbursement is not in order. Checks payable to Gus Fletcher and G. Guin, for example, show that, when compared with the "Truck Summary" in the record, they were paid at the rate of $1.25 per unit, with deductions from their gross earnings for fuel and expenses (Check #'s 590, 592). Each driver was required to bear his own expenses.

We have carefully checked and rechecked each and every ticket introduced by plaintiff which he claimed was unpaid. Every one was in fact paid at the rate of $1.25 per cu. yd. hauled.

Americ's counterclaim against Spikes must be dismissed due to our finding of no contract. Neither party was bound, and there was nothing for Spikes to breach that would expose him to liability on the counterclaim.

Therefore, for these reasons, which constitute the Court's findings of fact and conclusions of law pursuant to F.R.C.P. Rule 52, judgment will be entered in favor of plaintiff Herman Spikes against the defendants Americ, Incorporated, and American Fidelity Fire Insurance Company, for the grand sum of $762.75, plus interest and costs according to law. Judgment also will be entered in favor of plaintiff Herman Spikes dismissing the counterclaim of Americ, Inc. with prejudice.