**MONARCH CHEMICAL WORKS, INC., Plaintiff,**

v.

**J. James EXON, Joseph E. Vitek and City of Omaha, a Municipal Corporation, Defendants.**

Civ. No. 77–0–393.

United States District Court, D. Nebraska.

Feb. 12, 1979.

Annette E. Mason and Bruce G. Mason, Omaha, Neb., for plaintiff.

Gary R. Welch, Asst. Atty. Gen., State of Nebraska, for defendants, Exon and Vitek.

James E. Fellows, Patrick W. Kennison, Asst. City Attys., Omaha, Neb., for defendant, City of Omaha.

## MEMORANDUM

DENNEY, District Judge.

On June 13, 1978, this Court enjoined the named defendants in this lawsuit from condemning the plaintiff's land pending a determination by the City of Omaha of the need for a new environmental review. *Monarch Chemical Works, Inc. v. Exon*, 452 F.Supp. 493 (D.Neb.1978). The seeds of the controversy were planted when the municipality, in accordance with the Federal Housing and Community Development Act, prepared an environmental impact statement which addressed the relocation of the residents of an area known as East Omaha and the influx of new industries into the unimproved region. Subsequent to the circulation and adoption of the impact statement, the State of Nebraska entered into a contract with the City calling for the acquisition of approximately 33 acres in East Omaha for the construction of a medium/minimum security facility. The contract empowered the City to exercise its eminent domain powers to effectuate the transfer of title to the State. When the City of Omaha failed to observe federal regulations requiring the preparation of a written record setting forth reasons why no new environmental review was required despite the change in the redevelopment plan, the plaintiff filed the present action to prevent the City's condemnation of part of its property. The State of Nebraska's attempt to independently condemn Monarch's land to avoid the City's legal difficulties was unsuccessful, and a preliminary injunction issued against both the City and two named representatives of the State.

The defendants have now returned to this Court, praying for dissolution of the legal barrier that is blocking the construction of the correctional facility. In response to the Court's injunction, the City has prepared a written decision which concludes that the placement of a correctional facility within the East Omaha area does not constitute a significant change in circumstances which would warrant a new environmental review or clearance. Both the City and the State urge the Court to hold that the written decision is reasonable under the circumstances. Monarch resists the dissolution of the preliminary injunction, principally upon the ground that the City's decision failed to adequately analyze and consider all of the relevant environmental factors.

The Court combined a hearing upon the City of Omaha's motion to vacate the preliminary injunction with the final trial upon the merits. Evidence was adduced and final written arguments were submitted. After reviewing the record and considering the law, the Court concludes that the preliminary injunction should be lifted. As required by Rule 52(a) of the Federal Rules of Civil Procedure, the following findings of fact and conclusions of law support this decision.

### Redevelopment Plan and Original Impact Statement

The character and scope of the East Omaha Redevelopment Plan was described in detail at the time of the issuance of the preliminary injunction. *Monarch Chemical Works, Inc. v. Exon*, 452 F.Supp. at 496–97. Essentially, the Planning Department of the City of Omaha recognized the undesirability of land uses existing in a 120 acre area on the eastern edge of town near the Missouri River. This neighborhood, which lies to the south of Eppley Airfield, consists of a heterogeneous mix of residential, commercial, and heavy industrial land uses with few public improvements. A study of the problem led the City to the conclusion that "the highest, best, and most practical land use for East Omaha is that of a mixed commercial/industrial area, and that the best course of action for the City is to relocate the residents of East Omaha into safe and sanitary housing in more appropriate residential areas."

A grant from the Department of Housing and Urban Development, under the Housing and Community Development Act of 1974, provided the means to transform the City's plan into reality. Approximately 77.-76 acres of residential and vacant land within East Omaha were to be acquired through voluntary negotiation with landowners. Relocation of these residents would precede the demolition of the buildings upon the acquired land and the filling and grading of the vacant lots. No purchases of property owned and used by existing industries were to take place under the scheme of redevelopment, as the preferred land use already existed on these tracts.

Eminent domain proceedings were a possibility under the redevelopment plan if certain landowners refused to sell their holdings voluntarily. Condemnation of this property would allow the City to convert the municipally acquired portions of East Omaha into marketable industrial and commercial tracts. Proceeds from the sales of these parcels would partially fund the eventual installation of public improvements such as sewers and paved streets.

As allowed by Section 104(h)(1) of the Federal Housing and Community Development Act, HUD delegated the task of environmental review of the redevelopment plan to the City of Omaha. Pursuant to this delegation, the City prepared an environmental impact statement. The original EIS was a sixty page document which analyzed the topography and terrain of the area, present land uses, zoning requirements, existing street systems, drainage, existing storm and sanitary sewer systems, water services, and street lighting. Also addressed were the soils and geology of the area, hydrology, meteorology, climatology, vegetation, wildlife, aquatic habitat and solid waste disposal. The EIS further explored various impacts of the relocation upon the human environment, including social and economic factors, effects upon municipal services and utilities, land uses and traffic flow. The City considered the existence of noise and air pollution, historic properties, and housing to absorb the displaced East Omaha residents. Finally, the impact statement evaluated the unavoidable adverse environmental effects of the redevelopment plan, alternatives to the proposed action, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitments of resources that would result from implementation of the project. After circulation of the EIS and the consideration of comments from the Department of Interior and the Environmental Protection Agency, the City of Omaha incorporated some of the recommendations into the impact statement and concluded that the proposal should be implemented. The Department of Housing and Urban Development certified that the environmental review was complete under 24 C.F.R. § 58.30 (1978), and federal funds were released for the first phase of the redevelopment plan.

### Delegation of Environmental Duties

The City of Omaha was authorized to prepare an EIS by Section 104(h)(1) of the Federal Housing and Community Development Act:

. . . the Secretary, in lieu of the environmental protection procedures otherwise applicable, may under regulations provide for the release of funds for particular projects to applicants who assume all of the responsibilities for environmental review, decisionmaking, and action pursuant to such Act that would apply to the Secretary were he to undertake such projects as Federal projects. 42 U.S.C.A. § 5304(h)(1) (1977).

This federal statute further requires the recipient of federal funds "to assume the status of a responsible Federal official under the National Environmental Policy Act of 1969" and "to accept the jurisdiction of the Federal courts for the purpose of enforcement of his responsibilities as such an official." 42 U.S.C.A. § 5304(h)(3)(D) (1977).

The broad delegation of environmental duties under Section 104(h)(1) has been crit-

icized by commentators as passing "the difficulties of NEPA compliance one step down the line" to local governmental entities with insufficient technical expertise and unsophisticated legal assistance. Notis-McConarty, *Federal Accountability: Delegation of Responsibility by HUD Under NEPA*, 5 Envt'l.Aff. 121, 136–39 (1976). While this assessment may be a bit harsh, it seems clear that any local deficiencies in environmental compliance are not remedied by HUD participation or review. In contrast with the 1975 amendment to the National Policy Act itself, found at 42 U.S.C.A. § 4332(2)(D) (1977), HUD has the power to delegate environmental duties to any applicant for Community Development Act funds while relinquishing all responsibility for the consequences. Nor is HUD required to involve itself in the preparation of the impact statement. 42 U.S.C.A. § 5304(h)(1) (1977).

Regulations promulgated pursuant to Section 104(h)(1) compounded doubts about the statute. The regulations require virtually all recipients of Title I assistance to assume NEPA responsibility, regardless of the applicant's technical expertise. 24 C.F.R. § 58.5(a) (1978). HUD is never required to receive a copy of an impact statement prior to a release of funds. 24 C.F.R. § 58.30 (1978).

The flaw in the regulations that holds the most significance in the present case is a lack of sufficient procedural guidelines in the event that an applicant determines that an impact statement is unnecessary. 5 Envt'l.Aff., *supra*, at 141. Even less guidance is supplied for an applicant who must decide whether a change in the circumstances of an ongoing federal project warrants a new environmental review or clearance. Under 24 C.F.R. § 58.19 (1978), the following guidelines appear:

(a) *Original or updated environmental review.* A project which is a continuation of a previously commenced activity or activities for which no environmental review or clearance has been completed or for which previously conducted environmental reviews are insufficient due to

changed circumstances, including the availability of additional data or advances in technology, must be subjected to an original or updated environmental review under this Part. Such review shall be carried out with respect to the entire project to the extent that the entire project or portions of it could still be altered in light of environmental considerations.

.        .        .        .        .

(c) *No new environmental review.* A project which is a continuation of a previously commenced activity or activities for which environmental review or clearance has been completed and for which circumstances, including the availability of additional data or advances in technology, have not changed significantly, requires no new environmental review or clearance by virtue of such project's funding under Title I. The applicant shall prepare a written decision to that effect, which shall set forth the reasons therefor.

Subsequent to this Court's order granting the plaintiff preliminary relief, the City of Omaha decided that no new environmental review was warranted because of the construction of the correctional facility and the concomitant taking of the plaintiff's property. In support of this decision, the municipality prepared a written record of its reasons for reaching such a conclusion and sent a copy of the document to all of the local, regional, state and federal agencies that received the original impact statement.

The language contained within 24 C.F.R. § 58.19(c) (1978) is framed in terms of significant changes in presently existing circumstances. The Court believes that the decision-making process engaged in by recipients of HUD funds is conceptually similar to the environmental obligations that face a federal agency entrusted with making the threshold determination of the need for an environmental impact statement. Both reviews involve an evaluation of the environmental significance of impacts arising out of a major federal action. Given the similarities of the environmental obligations, the adoption of an analogous standard of review seems proper.

*Principles of Judicial Review*

This Court has recently considered the legal guidelines and standards of review applicable in a judicial evaluation of an agency decision to refrain from preparing an EIS. *Pokorny v. Costle*, 464 F.Supp 1273 (D.Neb.1979). A brief synopsis of the legal authorities and principles cited in that opinion is appropriate before a judicial consideration of Monarch's allegations of defects in the decision of the City.

■ Under the National Environmental Policy Act of 1969, the decision-making agency is entrusted with the task of making the threshold determination of the need for an environmental impact statement. *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1319 (8th Cir. 1974); *Hanly v. Mitchell*, 460 F.2d 640, 644 (2d Cir. 1972), *cert. denied* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). The regulations of the Department of Housing and Urban Development place a similar responsibility upon an applicant for Title I funds where an existing and ongoing project undergoes a change in circumstances. 24 C.F.R. § 58.19 (1978). Within the Eighth Circuit, the standard of review for these types of decisions is one of "reasonableness." *Minnesota Public Interest Research Group v. Butz*, 498 F.2d at 1320; *Pokorny v. Costle*, 464 F.Supp. at 1275; *Monarch Chemical Works, Inc. v. Exon*, 452 F.Supp. at 500; *Sierra Club v. Cavanaugh*, 447 F.Supp. 427, 431 (D.S.D.1978); *Patterson v. Exon*, 415 F.Supp. 1276, 1281 (D.Neb.1976).

■ In environmental disputes over the propriety of an entity's decision to refrain from filing an impact statement, the initial burden of demonstrating the existence of "substantial environmental issues" is placed upon the plaintiff. *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421, 425 (5th Cir. 1973); *Hiatt Grain & Feed, Inc. v. Bergland*, 446 F.Supp. 457, 490 (N.D.Ill. 1978). The plaintiff's obligation is satisfied if a deficiency in the administrative record can be established. Once this has taken place,

the burden will shift, as a general rule, to the federal agency which possesses the

labor, public resources and expertise to make the proper environmental assessment and to support it by a preponderance of the evidence.

*Simmans v. Grant*, 370 F.Supp. 5, 12 (S.D. Tex.1974).

■ The propriety of considering evidence outside of a deficient administrative record is a question that is closely related to allocation of the burden of proof. This issue is especially important where the applicable HUD regulations do not require that a record take any particular form. Upon a prima facie showing of an incomplete development of a written record by a decision-making entity, extrinsic evidence may be considered in a judicial evaluation of the reasonableness of a decision to refrain from an extensive environmental review. *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d at 425; *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 467 (5th Cir. 1973); *Mid-Shiawassee County Concerned Citizens v. Train*, 408 F.Supp. 650, 654 (E.D.Mich. 1976), *aff'd* 559 F.2d 1220 (6th Cir. 1977); *Jones v. HUD*, 390 F.Supp. 579, 591 (E.D. La.1974).

■ Although an administrative record must be compiled by the responsible official if a major federal action is adjudged to have either significant or insignificant environmental impacts, a comparison of the relative requirements is pertinent in the present case. Preparation of an environmental impact statement is often a lengthy and complicated undertaking that demands a detailed evaluation of environmentally significant impacts in accordance with a statutory outline. In contrast, HUD regulations provide virtually no guidance to the recipient of federal grant funds where a previously commenced activity experiences a change in circumstances. Logically, the written decision called for under 24 C.F.R. § 58.19(c) would not be nearly as detailed as a supplemental impact statement. The degree of significance of a particular project underlines this difference. Environmental protection would not be served by requiring an EIS where a major federal action is

insignificant within the meaning of NEPA. The amount of time that the preparation of a full-blown impact statement entails is out of proportion to the environmental risks involved. If a project's impacts are insignificant, the efforts of the decision-making entity can be directed toward the completion of proposed actions rather than the preparation of detailed documents that serve no environmental interest.

■■■ A final principle of review in environmental cases of this type deserves mention. A reviewing court should confine its inquiry to whether a responsible entity has reasonably concluded that a project has no significant adverse environmental impacts, and not whether such significant effects actually exist. *City of Davis v. Coleman*, 521 F.2d 661, 673 (9th Cir. 1975); *Pokorny v. Costle*, 464 F.Supp. at 1277. If the City of Omaha failed to consider a substantial environmental issue prior to the completion of the written decision required by 24 C.F.R. § 58.19(c), the Court cannot consider evidence on that issue in a review of the reasonableness of the municipality's decision. However, such evidence could be considered in an evaluation of whether an environmental plaintiff has demonstrated a deficiency in an administrative record of sufficient significance to warrant a shift in the burden of proof.

■■■ Despite the existence of time limitations on the consideration of evidence on the question of the reasonableness of a decision, no such restrictions impinge upon the character of admissible evidence. Oral testimony, exhibits and other substantive evidence can be considered in a judicial review of the propriety of a decision by a grant applicant. *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d at 425; *Save Our Ten Acres v. Kreger*, 472 F.2d at 467; *Jones v. HUD*, 390 F.Supp. at 591. If such extrinsic evidence shows that the grant applicant did in fact consider the environmental concerns raised in the plaintiff's pleadings, the decision is not automatically unreasonable solely because of the lack of formal discussion. *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d at 426; *First National Bank of Home-*

*stead v. Watson*, 363 F.Supp. 466, 474 (D.D. C.1973).

With these standards of review and legal guidelines firmly in mind, the Court shall turn to the plaintiff's allegations of defects in the City of Omaha's decision to proceed with the acquisition of land for the correctional facility without updating the original impact statement.

### Failure to Consider Alternatives

The Monarch Chemical Works asserts that both the original environmental impact statement and the supplemental decision by the City under 24 C.F.R. § 58.19(c) failed to consider alternative sites for the correctional facility that is now proposed for East Omaha.

The contention of the plaintiff with regard to the original EIS centers upon the failure of that document to address the possibility of construction of a medium/minimum facility within the redevelopment area when the State's site selection committee had already, for all intents and purposes, selected the East Omaha location. Because of the failure of the City to recognize the selection as a *fait accompli*, the plaintiff alleges a loss of a chance to meaningfully evaluate alternative locations before bias-inducing commitments to the present site took place. As the Court believes that the process of selection of the proposed East Omaha location is important not only on the issue of finalization of the site choice, but on the question of the timing of the presence of federal funding, a review of the pertinent sequence of events is in order.

On May 16, 1975, the state legislature passed a bill authorizing the construction of two new medium/minimum correctional facilities. One of the structures was required to be constructed in Douglas County, Nebraska. Omaha is the county seat for Douglas County. Subsequent to the statute's passage, a site selection committee was appointed by the Governor. During the summer of 1975, the committee investigated potential sites within Douglas County

and selected twenty-eight possible locations for the facility. Each of the sites was studied and evaluated for its size, estimated cost of acquisition, access to utilities, thoroughfares, and public transportation, topography and land use in the surrounding area. After the data on the sites had been accumulated, a personal inspection by the search committee took place. Public hearings were held on the suitability of the four sites that were judged to be best suited for the contemplated use. Subsequent to the hearings, two additional sites in East Omaha were proposed. One of these supplemental locations was finally selected by the committee, and a formal recommendation was forwarded to the Governor in the fall of 1975.

After examining the proposal by the site selection group, the Governor consulted with Joseph C. Vitek, the director of the State Department of Correctional Services at the time. Through Mr. Vitek, the State conferred with representatives of the Nebraska State Crime Commission, an LEAA planning agency. This commission contacted the National Clearinghouse for Criminal Justice Planning and Architecture for technical assistance in the evaluation of the suitability of the East Omaha site. On October 24, 1975, officials from the National Clearinghouse and the State personally inspected the recommended location. Approximately two weeks later, Mr. Kenneth Bishop, a Clearinghouse coordinator, concurred with the conclusion of the site selection committee in a letter to Mr. Vitek. In his approval of the suitability of the proposed location, Mr. Bishop specifically alluded to the lack of community objections and the availability of architectural and engineering technology to obviate noise problems from the adjacent airport. Based upon the Clearinghouse recommendation and other favorable information, the Governor agreed that acquisition of the property and construction of the facility should proceed.

During the search for a location for the Douglas County security facility, the State became aware of the City's acquisition of land in East Omaha. In fact, the record reflects that three members of the Governor's site selection committee were affiliated with the City of Omaha. A city council member, the head of the municipal planning department, and the public safety director for Omaha were all engaged in the selection process during the summer of 1975. Moreover, the City of Omaha and the State of Nebraska were engaged in preliminary negotiations for coordination of their separate goals and plans for the redevelopment area during the summer of 1975. Correspondence between these two governmental entities indicated a mutual desire to avoid duplication and unnecessary expense in the eventual acquisition of the tentative site.

Monarch maintains that such activities demonstrate the illusory nature of the original environmental impact statement. The EIS, which was given final approval by the Omaha city council in March of 1976, makes no mention of any correctional facility. The defendants, who concede the lack of discussion of construction of a penal facility, assert that the omission was due to the tentative nature of the location rather than a conscious effort to escape the reach of NEPA. A review of the record convinces the Court that no evasion of environmental duties was planned by the defendants. The City of Omaha published a notice informing the public of its decision to file an impact statement on the East Omaha Redevelopment Plan on October 28, 1975. Preparation of the EIS had commenced before the National Clearinghouse ever confirmed the suitability of the present location. The draft of the EIS was circulated, pursuant to 24 C.F.R. § 58.17(e) (1978), on November 17, 1975. During this time period, the State and the City were encountering problems in the financing of the correctional facility. Funding for the relocation of residents and the acquisition of the land was unresolved, principally because of strictures on the use of Title I funds from HUD. The uncertainty that surrounded the negotiations during this time period was of sufficient concern to prompt one of the members of the site selection committee to suggest an alterna-

tive site outside of the redevelopment area and to the east of the location that was recommended to the Governor. This proposal, which was advanced in January of 1976, offered the advantage of a cost savings due to ownership of the land by a single business and a concomitant reduction in relocation expenses. Preliminary negotiations with the owner of the tract were not promising. Data received from the Corps of Engineers on the increased potential for flooding also clouded the acquisition process. After several months of delay, State correctional officials decided to revert to the present site. In about May of 1976, the City's attorney and the State Attorney General's office began drafting proposed contracts outlining the nature of the cooperative scheme to acquire the 33 acres of land in East Omaha. It was not until August of 1976 that the parties to the contract agreed that the City could legally use federal funds for both acquisition and relocation. Omaha's city council did not adopt the joint acquisition agreement and amend the redevelopment plan until September 28, 1976.

The settling of funding problems and finalization of the location of the correctional facility took place long after comments were received on the draft EIS and incorporated into the impact statement. When the impact statement was finalized on February 5, 1976, the search committee was reconsidering its final recommendation to the Governor. No official sanctioning of the present site took place until seven months after the EIS had been filed.

■ The discussion of alternative courses of action in an environmental impact statement need not be exhaustive. *Minnesota Public Interest Research Group v. Butz*, 541 F.2d at 1300. NEPA does not require the exploration of conjectural possibilities, but the statute does force a responsible official to consider "alternatives as they exist and are likely to exist." *Carolina Environmental Study Group v. United States*, 166 U.S.App.D.C. 416, 421, 510 F.2d 796, 801 (1975). An impact statement need not consider an alternative "whose effect cannot be reasonably ascertained, and

whose implementation is deemed remote and speculative." *Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir. 1973), *cert. denied* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

■ The Court holds that, at the time of the preparation of the original environmental impact statement, the City was not required to address the alternative of institutional use. The location of the correctional facility did not crystalize until the EIS had been adopted. Inclusion of the facility within the alternatives section would have been premature and speculative, given the uncertainty that surrounded the final site selection and the procurement of funds.

■ A separate issue is Monarch's contention that the § 58.19(c) decision by the City of Omaha failed to consider alternatives to the placement of the correctional facility in East Omaha. Although the HUD regulations do not require such an inquiry, the National Environmental Policy Act of 1969 states that federal agencies shall

study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources . . . .

42 U.S.C.A. § 4332(2)(E) (1977).

This requirement, which is binding upon the City of Omaha under 42 U.S.C.A. § 5304(h)(1) (1977) and 24 C.F.R. § 58.5(a) (1978), exists whether an environmental impact statement is required or not. *Trinity Episcopal School Corp. v. Romney*, 523 F.2d 88, 93 (2d Cir. 1975). The Section 4332(2)(E) requirement is "independent of and of wider scope than the duty to file the EIS." *Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 93 (2d Cir. 1975). *Accord, Environmental Defense Fund, Inc. v. Callaway*, 497 F.2d 1340, 1341 (8th Cir. 1974) (per curiam); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 470 F.2d 289, 296 (8th Cir. 1972), *cert. denied* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973).

The only alternative considered in the City of Omaha's § 58.19(c) decision is related to land use rather than location.

A study of the character of the nexus between the City and the State in this lawsuit demonstrates an unusual factual pattern. Federal funds are to be spent for relocation and the acquisition of certain lands within the East Omaha Redevelopment Area. No HUD money, nor any other federal grants, are to be used in the construction of the institution. Placed squarely before the Court is the question of a grant recipient's duty to consider alternative sites when the substantive decision will be made by a different political entity.

Under NEPA, a federal agency is not excused from considering and evaluating alternatives to a project simply because such alternatives may be outside its jurisdiction or control. *Sierra Club v. Lynn*, 502 F.2d 43, 62 (5th Cir. 1974), *cert. denied* 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir. 1974); *Natural Resources Defense Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 12, 458 F.2d 827, 834 (1972). This general rule is not easily adapted to the facts in the present case. Courts that have required a consideration of alternatives by an agency that has no power to put these alternatives into effect usually contemplate the involvement of other federal agencies. Utilization of a group capable of analyzing programmatic environment problems that extend beyond the competence of a single agency has been judicially endorsed. *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d at 835. No group with enforcement powers exists in the case at bar. Certainly, the City of Omaha has no power to compel the State to assess alternatives to a location within a federally funded project restricted to a finite area. The Court can see no useful purpose in requiring the evaluation of other locations for a correctional facility when neither the grant recipient nor any other entity bound by NEPA has the power to make a final decision. Under these facts, the City is not required · to assess alternatives.

The Court notes that the State has already performed the substantial equivalent of the requirements of 42 U.S.C.A. § 4332(2)(E) insofar as that section mandates a hard look at alternative sites. The search committee was sensitive to surrounding land uses and community reaction during the process of choosing a suitable location from among the thirty proposed sites.

*Content of § 58.19(c) Decision*

Monarch Chemical raises a multitude of objections to both the substance of the § 58.19(c) decision and the city's methodology in its preparation. An overview of the municipality's written decision to refrain from engaging in a new environmental review is essential before the plaintiff's allegations of deficiencies can be put into proper perspective.

Omaha's § 58.19(c) report evaluated the municipal zoning ordinances applicable to an institutional land use and recognized the suitability of the proposed location. Further studied were the relative number of acres of building coverage and green space called for by the plans for the correctional facility as compared to typical patterns in industrial parks. Soils, geology, soil stability in the context of construction difficulties, grading and drainage were considered by the City. The decision further evaluated impacts upon utilities, sanitary sewers, historic properties, traffic and existing air pollution levels. Finally, the City studied the problem of noise pollution, both from the standpoint of noise generated by the facility and noise impacts upon the prison from Omaha's airport. The City's decision, taken as a whole, parallels in form the document that would be circulated subsequent to an updated environmental review under 24 C.F.R. § 58.15 (1978).

*Cost-Benefit Analysis*

The plaintiff points out the failure of the City to engage in a detailed cost-benefit analysis of the impact of placing a tax-supported facility in East Omaha to the detriment of the existing and future tax base. Monarch contends that this methodology is mandated by 24 C.F.R. §§ 58.15(c)(1) and (2) (1978), both of which require a considera-

tion of "design, use, location, cost and timing" in the context of possible project modification and alternative projects.

■■■■ The Court does not believe that the impact of a federal action upon a local tax base is a legitimate environmental factor that must be considered under NEPA. Both the HUD regulations and Section 102(2)(B) of the National Environmental Policy Act refer to more immediate costs. While an environmental decision-maker cannot divorce itself from economic concerns, neither is it required to investigate remote financial effects emanating from a project that has unrelated environmental impacts.

Monarch also faults the City's failure to prepare a cost-benefit study on the expenses associated with the correctional facility's secondary impacts. Specifically, the plaintiff focuses upon the costs of utilities, services and transportation that will arise from the facility's construction.

Courts and commentators have disagreed upon whether NEPA requires a formal cost-benefit analysis. *See generally Note, Cost-Benefit Analysis in the Courts: Judicial Review under NEPA*, 9 Georgia L.Rev. 417 (1975); Comment, *Judicial Review of Cost-Benefit Analysis under NEPA*, 53 Neb. L.Rev. 540 (1974). Within the Eighth Circuit, Section 102(2)(B) of the National Environmental Policy Act has been construed as not requiring

> a formal and mathematically precise cost-benefit analysis of proposed agency action. Specific assignment of dollar value to environmental factors, which are frequently not amenable to quantification, may not be necessary if the impact statement otherwise recognizes, discusses, and weighs the favorable and adverse effects of agency action.
>
> *Robinson v. Knebel*, 550 F.2d 422, 426 (8th Cir. 1977).

■■■■ Even if an agency does employ a precise cost-benefit formula as part of its preparation of an EIS, a federal court has no power to enjoin a release of funds for a major federal action. Congress must decide whether the benefits of a particular project outweigh its drawbacks when the agency attempts to procure appropriations. This legislative function cannot be usurped by a court. *Environmental Defense Fund, Inc. v. Corps of Engineers*, 325 F.Supp. 728, 740 (E.D.Ark.1970), *aff'd* 470 F.2d 289 (8th Cir. 1972), *cert. denied* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). *Accord, Environmental Defense Fund, Inc. v. Froehlke*, 368 F.Supp. 231, 241 (W.D.Mo.1973), *aff'd sub nom. Environmental Defense Fund, Inc. v. Callaway*, 497 F.2d 1340 (8th Cir. 1974).

■■■ The precedents cited by the Court are all controversies involving the use of cost-benefit formulas in full-blown environmental impact statements. The failure of a § 58.19(c) decision-maker to use a rigid mathematical formula in evaluating the desirability of a project is certainly unobjectionable if the preparer of an EIS is not required to do so.

*Failure to Consider Work Release Center*

■■■ Monarch attacks the validity of the City of Omaha's actions for failure to consider the environmental impacts of a proposed work-release center that will allegedly be constructed on a tract adjacent to the medium/minimum facility. The defendants do not dispute the fact that the City's § 58.19(c) decision confines itself to the environmental impacts of the medium/minimum prison without considering potential new or synergistic impacts that might be attributable to the center. Rather, the State and the City claim that the work-release center location is tentative, and that no meaningful environmental assessment is possible, given the speculative nature of its eventual construction within the redevelopment area.

After reviewing the Department of Correctional Service's Program Statement for the proposed work/education release center and considering the testimony at trial, the Court holds that the City's § 58.19(c) decision is not deficient for failure to consider the center's potential environmental impact.

Under Nebraska law, a program statement is required before a state agency can

engage in the construction of a facility. Funding for the proposed release center's program statement was obtained from the legislature during the 1977 session. A program statement analyzes the need for a certain activity and makes suggestions for implementation of proposals to attain recommended objectives. The work/education release facility's program statement was completed in August of 1978, a date subsequent to the City's preparation of its § 58.19(c) decision. Certain drawings within the program statement, which was prepared by an independent consulting firm, show the release center situated within the 33 acre area at issue in this litigation. A "location" section contained within the program statement similarly suggests a location adjacent to the medium/minimum facility.

While these portions of the program statement suggest the inevitability of the envisioned location, the introduction to the statement emphasizes "program flexibility and facility adaptability" to respond to future program changes. Jack Falconer, the correctional department's assistant director in charge of administrative services at the time of the hearing, stated that formal approval of the program statement was required before further funding was possible. He pointed out that some proposed programs were never funded by the state legislature, and that additional money would have to be secured before design development could commence. The state legislature has not limited the location of the release center to the 33 acre site in East Omaha, and Falconer indicated that the architectural phase might commence even if a definite location was not available for construction.

As a general proposition, an environmental impact statement is not required under NEPA when a project is in its planning stage. *Kleppe v. Sierra Club*, 427 U.S. 390, 403–06, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *Ortega v. Nebraska*, Civil No. 77–0–273, Slip Op. at 13 (D.Neb., filed Sept. 12, 1977). The same principle applies when uncertainty exists as to whether a facility will be built within an area of land procured with the use of federal money. An architect's schematic conception of a potential location for a structure is an insufficient indication of the need for a full environmental assessment of its impacts. More certainty is required before a federal court can justify the extraordinary remedy of equitable relief for failure to consider a relevant environmental factor.

*Impact upon Monarch*

Central to the plaintiff's attack upon the reasonableness of the City's decision is the failure of the municipality to consider the environmental impact of the construction of the correctional facility upon the future operation of the Monarch Chemical Works.

The Monarch Chemical Works is presently engaged, through subsidiary corporations, in the construction, asphalt supply, and oil reprocessing businesses. An important facet of the plaintiff's business involves the recycling and reconstituting of used lubricating oil. The waste oil is purchased from fleet owners, service stations and garages located in a five state area. Subsequent to treatment, the re-refined lubricant is principally sold to railroads for application to freight car bearings and journal boxes. Due to increasing regulation by the Environmental Protection Agency, only eleven companies in the United States presently engage in the business of reprocessing this kind of oil. Mr. Marvin Walenz, the president of Monarch, stated that his company serves an important role in energy conservation because of the fact that only three percent of a typical barrel of crude oil is of high enough quality to be refined into lubricating oil. The plaintiff maintains that any interruption of his business would cause the railroads who purchase his product to revert to the use of virgin oil. Monarch also engages in the production of processed asphalt suitable for use in the paving of roads.

In 1973, the EPA promulgated rules and regulations providing for safeguards against oil pollution. Owners of facilities which dealt with petroleum products in

quantity were required to prepare a spill prevention control plan. 40 C.F.R. § 112.3 (1977). This plan was to be prepared within six months of the effective date of the regulations and implemented within six months thereafter. Among other things, the applicable regulations require a secondary means of containment for spilled petroleum with a capacity sufficient to hold the contents of the largest tank on the premises plus freeboard for precipitation. 40 C.F.R. § 112.7(e)(2)(ii) (1977). In early 1974, the plaintiff devised a spill prevention plan. The document anticipated the acquisition of land to the east of 23rd Street in East Omaha for the purpose of constructing new tanks for the storage of heated asphalt and the building of a sump area, surrounded by a dike, to comply with the EPA requirements. All of the plaintiff's physical plant is presently located to the west of 23rd Street.

To effectuate the plan, Monarch attempted to negotiate with the owners of parcels located between 23rd and 25th Streets on the east and west, and Avenue "J" and Woodland Road on the north and south. The plaintiff ran headlong into the efforts of the defendants to acquire the same land for the correctional facility. At the present time, about fifty per cent of the land which the plaintiff desires to acquire is owned by the City. All of the remainder is owned by Monarch.

Faced with a potential daily fine of five thousand dollars for operation of its industry without implementation of a spill prevention plan, the plaintiff has cut back its oil re-refining business and uses tank cars, which are exempt from government regulation, for storage at the present time.

Monarch claims that the failure of the City of Omaha to consider the environmental consequences of the taking of the plaintiff's land for the reformatory violates HUD regulations and federal law. The plaintiff insists that it cannot locate its sump area in any location other than the land upon which the correctional facility is to be built. It is Monarch's contention that condemnation of its holdings constitutes both a direct and secondary impact upon the environment.

The Court does not agree. The adverse environmental impact that would allegedly take place if Monarch ceased operations is induced rather than direct. Changes in energy supply and demand that are induced by the closing of a recycling operation are the real concerns. The question that faces this Court is whether the City was required to consider these impacts.

The focus of the initial inquiry is causation. No need exists to address the City's alternative allegation that secondary impacts alone do not trigger NEPA protection if the chain of causation is too attenuated. Without the promulgation of the EPA requirements, Monarch would not have engaged in an intensive land acquisition effort. Even if the State had chosen a location for the correctional facility outside of East Omaha, there is no assurance that the plaintiff could have persuaded all of the landowners within the area to sell out. Given the relocation policies inherent in the East Omaha Development Plan, it is probable that holdout owners would have eventually sold their land to some industrial concern or faced condemnation under the second phase of the original relocation scheme. Although Monarch has engaged in a pattern of real estate acquisition that is designed to break up large contiguous parcels of land that might be attractive to competing businesses, an overview of the present ownership in this area shows that about fifty percent of the acreage owned by the City is an unbroken segment. A business that was interested in locating within the new industrial park could have blocked Monarch's attempts to comport with EPA regulations through the purchase of this property.

Moreover, the land which Monarch seeks to buy is not entirely alienable private property. A number of streets and alleys owned by the City would have to be vacated before the plaintiff's spill plan could be implemented. While vacation of these public roads is possible under state law, the city council must approve the plaintiff's peti-

tion. Any vacation of streets must conform to the overall plan for redevelopment in East Omaha.

■ After reviewing the record and respective arguments of counsel, the Court concludes that the City's § 58.19(c) decision is not deficient for failure to consider shifts in energy supply and demand induced by the cessation of the plaintiff's business. The defendants do not seek to condemn land that currently serves an environmental interest. There is no guarantee that the land in dispute would have been acquired by the plaintiff even if the correctional facility were not built. Monarch takes the position that the environmental decision-maker should have considered a secondary impact caused by an interruption of a plan that was subject to various contingencies from the outset. The Court holds that the applicable statutes and regulations do not require an evaluation of remote impacts associated with an attenuated and speculative chain of events.

*Direct Impacts of Correctional Facility*

■ In addition to the failure of the City of Omaha to consider the environmental impact of the prison upon its operations, Monarch claims that the City's § 58.19(c) decision is defective in its failure to adequately address the direct impact of building an institution in a proposed industrial park. The plaintiff points out that the movement of people out of the East Omaha area to make way for an industrial park was considered an event of sufficient significance to warrant the preparation of a full-blown EIS. Monarch maintains that the movement of people back into an area that was considered undesirable for residential uses is an event of equal significance that warrants a new environmental review or clearance.

While changes in land uses are often environmentally significant, the Court hesitates to hold that supplemental reviews are always required when such an event occurs. After a review of the record, the Court believes that the City has satisfied its obligations under HUD regulations.

The undesirability of the East Omaha area for residential uses at the time of the preparation of the original impact statement was related to the lack of public improvements and basic utilities, the poverty of the inhabitants, and poor drainage. Relocation of residents of the region was the thrust of the original EIS.

In contrast, the correctional facility will cause no displacement of residents not contemplated in the original impact statement. Utilities, sanitary sewers and storm sewers will serve the inmates and employees. A grading plan, prepared by a consulting engineering firm, will eliminate low-lying areas which presently serve to collect water. Soil studies have resulted in an application of engineering techniques to mitigate potential foundational problems. All of these subjects were addressed in the City's § 58.-19(c) decision. Monarch has failed to demonstrate a deficiency in the record with regard to any of these areas. Nor does the evidence suggest that the City's decision to refrain from engaging in a more intensive environmental review was unreasonable. The municipality's consideration of the direct impacts of the correctional facility was adequate under the regulations.

*Secondary Impacts of Correctional Facility*

■ Monarch alleges that the City's decision to refrain from engaging in a new environmental review is further deficient because of its failure to consider the secondary impacts caused by the construction of the prison complex. Specifically, the plaintiff in its amended complaint asserts that the original impact statement lacked discussion of induced changes in patterns of land usage, the population density, increased automobile and pedestrian traffic, air and noise pollution, increased demands upon sanitary sewer systems as well as gas and water services, and the socio-economic consequences of the construction of a prison upon industrial and commercial growth. Although not within its pleadings, evidence was adduced at trial on the effect of the proposed facility on the security measures employed at the City's municipal airport.

These types of impacts are typically cognizable under NEPA. *Chelsea Neighborhood Ass'ns. v. United States Postal Service*, 516 F.2d 378 (2d Cir. 1975); *Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972), *cert. denied* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). *See also* 40 C.F.R. § 1500.-8(a)(3)(ii) (1977).

The defendants advance the argument that the City is not required to consider secondary impacts in the absence of primary and significant environmental effects. Substantial case law supports this proposition. *Image of Greater San Antonio, Texas v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978); *Breckinridge v. Rumsfeld*, 537 F.2d 864, 866–67 (6th Cir. 1976), *cert. denied* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *National Association of Government Employees v. Rumsfeld*, 418 F.Supp. 1302, 1305–06 (E.D.Pa.1976); *National Association of Government Employees v. Rumsfeld*, 413 F.Supp. 1224, 1229–30 (D.D.C.1976), *aff'd sub nom. National Association of Government Employees v. Brown*, 181 U.S. App.D.C. 199, 556 F.2d 76 (1977).

Monarch cites the case of *McDowell v. Schlesinger*, 404 F.Supp. 221 (W.D.Mo.1975), as authority to the contrary. A reading of that opinion leaves some doubt as to whether a direct impact existed in tandem with the socio-economic impacts that resulted from a shift in air force personnel from one state to another. One other court has read *McDowell* as involving a primary effect upon the physical environment as well as secondary impacts. *Metlakatla Community v. Adams*, 427 F.Supp. 871, 875 (D.D.C. 1977). It appears that the Eighth Circuit, in a collateral consideration of the applicability of NEPA in *McDowell*, has reached a similar conclusion. *Jackson County v. Jones*, 571 F.2d 1004, 1007 (8th Cir. 1978).

■ Based upon the foregoing precedents and the Court's prior holding that the construction of the correctional facility in East Omaha will have no significant direct effect on the environment, the Court concludes that no consideration of secondary impacts was required in the City's § 58.19(c) decision. Because of the possibility of appeal in this case and the indefinite language used by the Eighth Circuit in *Jackson County*, the Court alternatively holds that the City considered all of the relevant secondary impacts and reasonably concluded that their effects on the environment were insignificant.

■ The City's § 58.19(c) decision does not address induced changes in industrial land use patterns in East Omaha as a result of the construction of the correctional facility. This omission does not constitute a deficiency in the administrative record of sufficient significance to warrant a shifting of the burden of proof. The East Omaha Redevelopment Plan does not anticipate the influx of non-industrial uses into the area. Moreover, Monarch has failed to demonstrate that a change in surrounding land uses is probable or likely. The plaintiff has not established the existence of a substantial environmental issue on this question.

■ Nor does the City's written decision consider the secondary impact of increased pedestrian traffic. Again, the Court holds that the plaintiff has failed to show the presence of a substantial environmental issue. No permanent residential areas are located within a quarter of a mile of the East Omaha Redevelopment Area. The main mode of access to the facility will be by automobile or other motorized transportation. The Court believes that the alleged "deficiency" in the record is not due to the City's oversight, but instead to the insignificance of the alleged impact. All documents are deficient in one respect or another. A litigant should not be able to obtain an injunction against a project simply by pointing to minor environmental deficiencies in a written decision that logically calls for a succinct analysis.

The City's decision specifically addresses increased traffic flows, and concludes that the correctional facility would induce less automobile traffic than an industry by a 6:1 ratio. Substantially less truck traffic would be associated with a prison than an industry. Air pollution and noise pollution would be less, according to the City, than

that associated with the types of businesses that are expected to locate in East Omaha. Demand upon sanitary sewers would be less for a correctional facility than an industry, and the character of the correctional effluent would be within the treatment capacity of existing sewage plants. The City has also contacted local power and utility companies to assure the availability of gas, water and electricity in sufficient amounts to serve the needs of the prison. Interim ditches will be constructed pending the installation of new storm sewers. All of these factors have been considered by the City and incorporated into the administrative record. The municipality's conclusion that these impacts do not warrant a new environmental review is reasonable.

■ Omaha's § 58.19(c) decision does not consider the effect on commercial growth of the location of a prison in an industrial park. NEPA does not require an evaluation of the psychological and sociological effects of a prison on people who live nearby. *Hanly v. Kleindienst,* 471 F.2d at 833. *Accord, Nucleus of Chicago Homeowner's Ass'n. v. Lynn,* 524 F.2d 225, 231 (7th Cir. 1975), *cert. denied* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). Logically, even less of an obligation exists to evaluate a prison's impact on future businesses that might locate on adjacent land.

■ A final secondary impact that was mentioned at trial was the possibility of an induced change in security measures at the adjacent airfield. Again, the plaintiff has failed to raise a significant and substantial environmental concern. At trial, the executive director for the Omaha Airport Authority testified that the prison would cause the airfield no adverse security problems. Monarch has not carried its burden of proof on this question.

### Impact of Surrounding Environment on Correctional Facility

Noise which emanates from the municipal airport is addressed in the City's written statement. The rather unique question that remains is whether any federal laws or environmental regulations require a consideration of noise pollution upon a project subject to NEPA.

The dearth of case law on the subject suggests the novelty of the contention. Only one federal district court has directly faced the question, and its determination was essentially dictum. In *Clinton Community Hospital Corp. v. Southern Maryland Medical Center,* 374 F.Supp. 450, 456–47 (D.Md.1974), a hospital attempted to raise NEPA issues involving the location of a competitive medical facility three miles south of an air force base runway. While basing its decision on the plaintiff's lack of standing, the *Clinton* court stated that NEPA did not require a consideration of the effect of the surrounding environment on a federal action. Curiously, the *Clinton* court rejected the plaintiff's "extraordinary and bizarre proposition" by directly holding that the environment which NEPA was created to protect did not include human beings. On appeal, the Fourth Circuit Court of Appeals affirmed the plaintiff's lack of standing, but made the further observation that the complaint "turns the statutory scheme 180 degrees around." *Clinton Community Hospital Corporation v. Southern Maryland Medical Center,* 510 F.2d 1037, 1038 (4th Cir. 1975), *cert. denied* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975) (Douglas, J. would grant certiorari). At least one federal court has approved the position of the Fourth Circuit, but the statement of support is expressed in terms of standing. *Mobil Oil Corp. v. F.T.C.,* 430 F.Supp. 855, 863 (S.D.N.Y.1977), *rev'd on other grounds* 562 F.2d 170 (2d Cir. 1977).

A review of NEPA's language casts some doubt upon the contention that the environment does not include human beings. Section 102(2)(C) of NEPA requires an impact statement for action "significantly affecting the quality of the human environment." 42 U.S.C.A. § 4332(2)(C) (1977). The statute is replete with references to the interrelationship of man and his surroundings and

concern for human welfare. An examination of judicial decisions in the area demonstrates that the term "reaches just about everything important to people", including crime and overpopulation, race relations, employment and the availability of schools and housing. W. Rodgers, Handbook on Environmental Law § 7.6 at 754 (1977).

Even if this Court adopts a broad definition of the reach of man's environment, the question of considering impacts of that environment upon a federal action remains. One court that has considered the effect of a future environment created by the construction of housing upon future tenants did so without acknowledging, or perhaps realizing, the conceptual distinction. *See, e. g. Chelsea Neighborhood Ass'ns. v. United States Postal Service*, 516 F.2d at 388.

Although the plaintiff's position is intriguing and arguably supportable by the language of the Act, the Court declines to encourage creative litigation when NEPA does not clearly call for such an expansive interpretation. Regulations promulgated by the CEQ do not mention impacts of the environment on a project. Nor do HUD guidelines call for such a result. If Congress chooses to amend the Environmental Policy Act to require the consideration of these types of "reverse impacts", the effect of noise upon a federal action would have to be evaluated by the environmental decision-maker. Until that day, the Court will refrain from legislating through judicial decree. While the impact of aircraft noise should be considered in any proposal for a land use, NEPA is not a tool for the enforcement of responsible consideration of good planning principles under all circumstances.

In its amended complaint, Monarch prayed for injunctive relief pending compliance with various environmental statutes and regulations. As the City of Omaha has fulfilled all of its duties in that regard, the Court shall enter an order vacating the preliminary injunction and denying the plaintiff's application for permanent relief as to all of the named defendants.